UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


PAUL R. VILLELLA,                    :
        Plaintiff,                   :
                                     :
     v.                              :   Case No. 3:07cv1442(JCH)
                                     :
MICHAEL J. ASTRUE,                   :
COMMISSIONER OF SOCIAL SECURITY,:
        Defendant                    :


**RECOMMENDED RULING ON PENDING MOTIONS**

Plaintiff, Paul R. Villella, filed this action seeking
review, pursuant to 42 U.S.C. § 405(g), of the decision of the
Commissioner denying his claim for disability insurance benefits
("DIB") and Supplemental Security Income ("SSI") benefits under
the Social Security Act.  Plaintiff seeks an order reversing the
decision of the Commissioner or, in the alternative, a remand for
further proceedings.  Defendant seeks an order affirming the
decision of the Commissioner.  Upon consideration of the motions,
the court recommends that plaintiff's motion be denied and
defendant's motion be granted.

**I.    ADMINISTRATIVE BACKGROUND**

On November 18, 2003, plaintiff filed applications for DIB
and SSI benefits.  (R. 57-59, 503-05.)[1]  He alleges that he
became disabled on September 1, 2000.  In the disability report

_____

        [1]  The administrative record filed by the Commissioner shall
be referred to as "R.".

completed at the time of his applications, plaintiff identified the disability under which he suffers as Hepatitis C, back pain, leg pain, pelvis pain, shoulder pain, past drug abuse and a heart condition. (R. 72.) Plaintiff's applications were denied initially on June 23, 2004, and upon reconsideration on September 23, 2004. (R. 26, 27, 506, 508.)

On November 10, 2004, plaintiff requested a hearing by an Administrative Law Judge ("ALJ"). (R. 36.) A hearing was held before ALJ Deirdre Horton on September 27, 2005. (R. 600-28.)[2] Plaintiff appeared with counsel at the hearing. On February 21, 2006, the ALJ determined that plaintiff was not disabled and denied benefits. (R. 16-25.)

On March 27, 2006, plaintiff requested review of the denial by the Appeals Council. (R. 13-15.) On August 10, 2007, the Appeals Council upheld the denial of benefits. (R. 7-10.) Plaintiff commenced this action on September 24, 2007.

## II. FACTUAL BACKGROUND

Plaintiff was born on August 28, 1949. (R. 57.) He attended college but has no degree. (R. 610.) He was married twice and divorced both times. (R. 57.) Plaintiff now shares an apartment with his mother and another tenant. (R. 86.)

From 1989 until September 1, 2000, plaintiff worked as a

_____

[2]The transcript of the hearing is incorrectly numbered in the record as pages 560-88. The court has corrected the numbering for this ruling as 600-628.

case manager at the Westport Men's Shelter. (R. 73, 610-11.)
During an eight-hour workday, he stood for two hours, walked for
two hours and sat for four hours. Plaintiff reports that the
heaviest weight he lifted was twenty pounds and that he
frequently lifted twenty-five pounds. (R. 73.) Plaintiff did
not get along with the new director. The program was changed and
his job was terminated. (R. 72, 611-12.)

In 2003, plaintiff stated that he spent his day attending AA
meetings and looking for more inexpensive housing. He was able
to fold clothes, vacuum and sweep. He was unable to stand for
long periods, lift heavy objects or do heavy work. With
medication, plaintiff slept between four and six hours per night.
Plaintiff stated that he used a cane to walk long distances and
had to rest frequently. (R. 87, 89, 92.) He was able to drive
to shop or go to tag sales. (R. 89-91.)

Plaintiff has a history of substance abuse but denies using
alcohol or opiates for sixteen years prior to the onset of his
disability. (R. 85.) When he was interviewed in connection with
his applications, the reviewer noted no difficulties sitting,
standing, walking, reading, understanding or responding to
questions. (R. 83.)

Plaintiff completed a supplementary report in February
2004. He stated that he felt sad, had no energy, showed a lack
of interest and had trouble sleeping. Plaintiff reported that he
could often sit or stand and sometimes walk, bend, lift, grasp,

push and pull.  He could lift twenty pounds and frequently could
lift ten pounds.  Plaintiff stated that his pain interfered with
his ability to sleep and, if he were still working, would
interfere with his ability to think about his clients
individually.  (R. 137-40.)  However, plaintiff identified the
following regular activities:  playing games, talking on the
phone, doing arts and crafts, painting or drawing, fishing,
reading and watching television.  In addition, he shopped for
food, planned meals, cooked, washed dishes, did laundry,
vacuumed, mopped, swept, made the bed, emptied trash and mowed
the lawn.  He had no problems paying attention, understanding,
listening, reading, remembering or learning new things.  (R.
138.)

Dr. Perlin, plaintiff's treating physician, assessed
plaintiff's residual functional capacity in two forms completed
in February 2004.  In the first form, Dr. Perlin opined that
plaintiff has the ability to sit, stand and walk for one hour
each during an eight-hour workday.  He could frequently lift and
carry up to five pounds and occasionally lift and carry up to
twenty pounds.  (R. 144-45.)  In the second form, Dr. Perlin
altered his opinion and stated that plaintiff could sit for one
hour in an eight-hour workday but never walk or stand.  He
occasionally could lift and carry up to five pounds but never
lift or carry anything heavier.  (R. 153-54.)

On the first form, Dr. Perlin stated that plaintiff has no

4

mental problems.  (R. 146).  In the second form, he completed the
mental residual functional capacity questions but indicated in
all categories that plaintiff was not significantly limited.  (R.
156-57.)

In September 2004, a consultative physician completed a
physical residual functional capacity assessment.  The doctor
found that plaintiff could occasionally lift and carry fifty
pounds and frequently lift and carry up to twenty-five pounds.
He could stand or walk for six hours and sit for six hours in an
eight hour workday.  The doctor acknowledged that his assessment
differed from Dr. Perlin's but noted that Dr. Perlin did not
support any of the limitations he specified.  (R. 160-67.)

### III. MEDICAL RECORDS

Dr. Martin Perlin has treated plaintiff since 1997 for
chronic back pain, hepatitis C, chronic pinched nerves, heart
issues, chronic shoulder pain and lack of sleep.  Plaintiff had
his gall bladder removed and underwent angioplasty in 1998.  He
provides no hospital records for these procedures.  (R. 74, 75.)

Plaintiff states that, in November 2003, Dr. Perlin was
prescribing him Oxycontin, hypertension medication, acid reflux
medication, Vioxx and blood thinners.  (R. 77. )  There are no
medical records from Dr. Perlin indicating when he began
prescribing any of the medications.  Only two records from 2005
list current medications plaintiff was then taking, a few

letters[3] recommend continuing current medications and one medical record from 2005 renews plaintiff's medications.  (R. 251, 255, 257, 281, 282, 287.)

On February 11, 2001, plaintiff went to the Norwalk Hospital Emergency Room ("Norwalk ER") complaining of chest and back pain. Plaintiff noted a history of panic attacks.  (R. 172-74.)  A February 27, 2001 EMG report showed left C7 radiculopathy and mild left carpal tunnel syndrome.  (R. 175.)

On June 3, 2002, plaintiff went to the Norwalk ER complaining of chest pain.  A chest x-ray was within normal limits.  Plaintiff left with instructions to consult his primary care physician.  (R. 178-80.)  Plaintiff returned to the Norwalk ER on July 16, 2002, complaining of neck and chest pain.  X-rays showed no evidence of pulmonary disease and no significant changes from the previous x-ray.  Plaintiff left three hours later against medical advice because he feared his pain medication dosage would be questioned and possibly discontinued. (R. 181-89.)  Plaintiff returned to the Norwalk ER on August 25, 2002, complaining of chest pain and palpitations.  Again, a chest x-ray was normal.  (R. 190-94.)

In 2003, plaintiff made a series of brief emergency room

---

[3]The record includes eight letters all bearing the date September 25, 2005.  Two of the letters direct plaintiff to schedule office visits in June 2004 and April 2004.  Thus, the dates are incorrect and the court cannot discern exactly when each letter was written.  (R. 280-87).

visits.  On April 23, 2003, he arrived at St. Vincent Hospital
Emergency Room ("St. Vincent ER") at 1:25 p.m., complaining of
chest pain, and left at 3:59 p.m.  (R. 195.)  On August 22, 2003,
he arrived at St. Vincent ER at 1:36 p.m. and left at 2:05 p.m.
with instructions to see his primary care doctor for his
complaints of back and shoulder pain.  (R. 196-97.)  On October
10, 2003, plaintiff arrived at St. Vincent ER at 4:58 a.m.
complaining of difficulty sleeping and chest pain.  He left at
6:00 a.m. with instructions to see his primary care physician.
(R. 198-99).  On October 21, 2003, plaintiff went to St. Vincent
ER twice.  He arrived at 2:43 a.m. complaining of mild epigastric
pain radiating to his back.  He left without being seen because
he felt better.  (R. 200-02.)  He returned at 11:25 a.m. and left
at 12:45 p.m. with instructions to consult his physician.  (R.
203.)  On November 3, 2003, plaintiff arrived at the Norwalk ER
at 3:15 p.m. complaining of back pain.  He left at 5:15 p.m.  (R.
204-11.)  On December 21, 2003, plaintiff went to the Norwalk ER
complaining that he experienced chest pain when lying down.  The
pain subsided when he sat up.  A chest x-ray was nonremarkable.
(R. 168-71.)  On December 26, 2003, plaintiff arrived at the
Norwalk ER at 3:38 a.m. complaining of chronic pain, fever and
shortness of breath.  He left without treatment because he felt
better and told treatment providers that he had an appointment
with his primary care physician that day.  (R. 212-13.)

In 2003, plaintiff also visited Dr. Perlin.  On July 31,

7

August 8 and September 12, Dr. Perlin evaluated plaintiff for thrombocytopenia.[4]  The only notation regarding this condition is that no easy bruising was evident on July 31, 2002.  (R. 244-47.) On August 8, 2003, Dr. Perlin also conducted a follow-up examination for benign prostatic hypertrophy.  On November 21, 2003, Dr. Perlin conducted a follow-up examination for Hepatitis C.  In response to plaintiff's complaint of back pain, Dr. Perlin determined that plaintiff suffered from sciatica.  (R. 248.) None of these reports contain any information regarding plaintiff's ailments or evaluations of the effectiveness of prescribed medications.

Plaintiff abused pain medication as a result of chronic back pain from a motor vehicle accident and his gall bladder surgery in 2002.  On January 8, 2004, he expressed suicidal ideation in the Norwalk ER.  The following day, he was admitted to Norwalk Hospital to undergo an opiate detoxification protocol in an attempt to reduce his dependency.  Plaintiff denied addiction to Oxycontin and was ambivalent to treatment.  He refused to take other medications, such as Celebrex, for pain.  When he was informed that he would not receive narcotic pain medication, he signed himself out of the program against medical advice.  (R. 214-27, 288-333.)

On February 23, 2004, Dr. Perlin examined plaintiff for

_____

[4]An abnormally small number of platelets in the circulating blood.  Stedman's Medical Dictionary 1596 (25th ed. 1990).

Bell's palsy, which began on February 15, 2004. No treatment was noted. (R. 133.) Also in February 2004, Dr. Perlin completed two medical evaluation forms. (R. 143-48, 149-59.) In the first form, Dr. Perlin stated that he was treating plaintiff only in routine office visits for Hepatitis C and fatigue, spinal stenosis, and facial droop as a result of Bell's palsy. (R. 143-44, 147.) In the second form, Dr. Perlin states that he was treating plaintiff for Hepatitis C, thrombocytopenia, and hypertension, again only in routine office visits. (R. 152, 158.) Regarding hepatitis C, Dr. Perlin noted that plaintiff has increased LFTs with asthenia, i.e., weakness. (R. 152.) Dr. Perlin also indicated diagnoses of high blood pressure based on reported headaches, hepatitis C based on asthenia and increased LFTs, and gastrointestinal reflux disease ("GERD"). (R. 153.)

Plaintiff continued to make brief visits to the emergency room in 2004. On January 26, 2004, he arrived at the St. Vincent ER at 2:54 a.m. complaining of chest and left arm pain and left at 4:35 a.m. (R. 228-29.) On February 29, 2004, he arrived at 1:13 a.m. and left at 2:50 a.m. Plaintiff's complaints of chest and abdominal pain were diagnosed as constipation. (R. 230-32.) On March 14, 2004, he arrived at 1:35 a.m. complaining of chest and abdominal pain. A chest x-ray was normal. Plaintiff left at 9:50 a.m. after being diagnosed with GERD. (R. 233-35.)

On March 24, 2004, Dr. Perlin evaluated plaintiff for chronic back pain. Treatment notes indicate mild pain.

9

Plaintiff had full flexion, extension, rotation and lateral bending without apparent pain or discomfort. Dr. Perlin noted a normal distal neurovascular examination. His assessment was lumbar spinal stenosis. (R. 131.)

On April 10, 2004, plaintiff arrived at St. Vincent ER at 4:00 p.m., complaining of chest pain. A chest x-ray was stable and he left at 7:55 p.m. (R. 236-37.) On June 11, 2004, plaintiff was seen at St. Vincent ER between 2:20 a.m. and 3:46 a.m. for complaints of acid reflux. (R. 238-40.)

On May 5, 2004, and July 12, 2004, Dr. Perlin saw plaintiff for Hepatitis C follow-ups. No treatment or evaluation of the condition was noted. In response to plaintiff's complaint of left hand pain, Dr. Perlin referred plaintiff to an orthopedic surgeon. (R. 127, 129.) No treatment records are provided.

On September 7, 2004, plaintiff arrived at the St. Vincent ER at 3:51 a.m. complaining of abdominal pain. He left at 6:45 a.m., stating that he felt better. (R. 334-40.) On October 1, 2004, plaintiff reported to St. Vincent ER at 7:09 p.m. complaining of chest pain. A chest x-ray was unremarkable and he was discharged at 2:30 a.m. with a diagnosis of bronchitis. (R. 252-63.) On October 9, 2004, plaintiff arrived at St. Vincent ER at 12:49 a.m., again complaining of chest pain. He was diagnosed as suffering from costochrondritis/upper back strain and instructed to follow-up with his primary care physician. Plaintiff left at 4:50 a.m. (R. 341.) Later that afternoon,

plaintiff returned complaining of chest pain.  X-rays revealed no active pulmonary disease.  (R. 342, 345.)

On November 18, 2004, at a follow-up visit for coronary artery disease, plaintiff complained of chest discomfort.  Dr. Perlin noted that examination of plaintiff's lungs, abdomen and heart was normal and an ECG, which showed a first degree AV blockage, was unchanged from prior tests.  (R. 249-50.)

On December 22, 2004, plaintiff reported to St. Vincent ER complaining of chest pain.  He arrived at 2:28 p.m. and, although treatment providers recommended admission, left at 5:00 p.m. after receiving a chest x-ray.  (R. 364-73.)  On December 30, 2004, plaintiff returned to St. Vincent ER complaining of chest pain.  Again, he left after receiving a chest x-ray.  (R. 374-87.)

On January 21, 2005, Dr. Perlin renewed plaintiff's medications and referred him to a hand surgeon.  (R. 251.)  The record contains no evidence that plaintiff followed up on the referral.  On May 2, 2005, plaintiff saw Dr. Perlin for a follow-up for spinal stenosis and hepatitis C.  Plaintiff's heart and abdomen were normal.  Dr. Perlin counseled plaintiff on diet, exercise and compliance with his medication regimen and referred him to an orthopedic surgeon.  (R. 253.)  Again, there is no evidence that plaintiff ever saw the orthopedic surgeon.

On February 8, 2005, at 2:23 p.m., plaintiff went to the Bridgeport Hospital Emergency Room ("Bridgeport ER") complaining

of back pain.  He was given Percocet and released at 3:40 p.m.
(R. 388-94.)  On February 15, 2005, plaintiff reported to St.
Vincent ER at 8:47 a.m.  He stated that he fell down three or
four steps and was experiencing low back pain.  Plaintiff was
given Percocet and Motion 600 and told to use ice and heat.  He
left at 10:15 a.m.  (R. 395-99.)  The following day, plaintiff
returned to St. Vincent ER complaining of abdominal pain and
vomiting.  He was diagnosed as suffering from hepatic
encephalopathy[5] and referred to his primary care physician.  (R.
400-13.)  The treating physician's records make no reference to
this diagnosis.

On April 7, 2005, plaintiff reported to Bridgeport ER at
10:24 a.m. complaining of chest pain.  A psychological evaluation
recommended that he enter a program for detoxification from
Oxycontin.  Plaintiff was discharged at 4:00 p.m. after being
advised to follow up with the program.  (R. 414-20).  On June 10,
2005, plaintiff returned to Bridgeport ER complaining of chest
pains.  He was advised to continue taking nitroglycerin for chest
pain, told that he was addicted to Oxycontin and advised to stop
taking that drug.  (R. 421-31.)

On July 18, 2005, plaintiff reported to Dr. Perlin
complaining of abdominal discomfort.  Dr. Perlin listed
plaintiff's current medications and ordered routine abdominal x-

---

[5]A disease of the brain associated with cirrhosis of the
liver.  Stedman's Medical Dictionary 508 (25th Ed. 1990).

rays.  Dr. Perlin noted that plaintiff had come in complaining of chest pain one week earlier.  EMTs were called.  Plaintiff's EKG was normal as was the examination of his heart, lungs and abdomen.  (R. 255.)  No record was provided for this visit.

On August 30, 2005, plaintiff went to St. Vincent ER complaining of chest pain.  He was advised to see his primary care physician.  (R. 432-39.)  Plaintiff returned to St. Vincent ER on September 1, 2005, again complaining of chest pain. Plaintiff was given morphine in the ER and treatment providers questioned whether plaintiff was drug-seeking.  X-rays showed no sign of pneumonia and a CT scan of the head, to determine whether plaintiff had altered mental status, was normal.  (R. 440-56.)

On September 10, 2005, at 3:51 a.m., plaintiff reported to Bridgeport ER, complaining of chest pain.  He stated that he had experienced chest pain during the night.  The pain disappeared after he took nitroglycerin and Oxycodone.  A chest x-ray was stable with no sign of active pulmonary disease.  (R. 457-69).

On September 19, 2005, plaintiff saw Dr. Perlin for a follow-up visit for hepatitis C.  Dr. Perlin noted that plaintiff's heart, lungs and abdomen were normal and listed plaintiff's medications.  Plaintiff refused to be weighed or to have blood drawn for testing.  He only wanted Dr. Perlin to complete disability forms.  (R. 257.)

On September 30, 2005, plaintiff went to St. Vincent ER at 3:26 a.m. complaining of chest pain.  The doctors would not give

him Oxycodone or Percocet and plaintiff left at 8:35 a.m. against medical advice.  (R. 470-81.)

## IV.  STANDARD OF REVIEW

The court's review of the Commissioner's final decision is limited to determining whether the ALJ applied the correct legal standard and whether there is "substantial evidence" in the record to support her determination.  Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 127 S. Ct. 2981 (2007); 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998).  In conducting this review, the court affords substantial deference to the Commissioner's decision.  The court does not decide facts, reweigh the evidence or substitute its own judgment for that of the Commissioner even if the court might justifiably have reached a different decision if it were reviewing the case de novo.  Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993). The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  However, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence

standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according to correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998) (citation omitted).

## V. DISABILITY UNDER THE SOCIAL SECURITY ACT

In order to establish an entitlement to disability benefits under the Social Security Act, a claimant must prove that he is "disabled" within the meaning of the Act. A claimant may be considered disabled, and eligible for DIB or SSI benefits, only if he cannot engage in any substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that twelve months. 42 U.S.C. § 423(d)(1)(A); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

The impairment must be supported by medically acceptable clinical and laboratory techniques. 42 U.S.C. § 423(d)(3). A disability will be found to exist only if the severity of the impairment is based on objective medical facts, diagnoses or medical opinions that can be inferred from these facts, subjective complaints of pain or disability, educational background, age and work experience. Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983).

Determining whether a claimant is disabled requires a five-step process.  First, the court must determine whether the claimant is currently working.  If the claimant is currently employed, the claim is disallowed.  20 C.F.R. § 404.1520(b), 416.920(b).  If the claimant is not working, as a second step, the agency must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is denied.  <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c).  The impairment must be of such severity that the claimant is not only unable to do his previous work but also, considering his age, education, and work experience, cannot engage in any other kind of substantial gainful employment which exists in the regulations (the "Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141 (1987).  As step three, the claimant's impairment is compared with the impairments in the Listings.  If the claimant's impairment meets or medically equals one of the impairments in the Listings, the claimant is presumed to be disabled.  20 C.F.R. §§ 404.1520(d), 416.920(d); <u>Shaal v. Apfel</u>, 134 F.3d at 501.  If the claimant's impairment does not meet or medically equal one of the listed impairments, as a fourth step, he will have to show that he does not possess the residual functional capacity to perform his past relevant work.[6]  20

_____

[6]"Residual functional capacity" refers to what a claimant still can do in a work setting despite his physical and mental limitations caused by his impairment, including related symptoms such as pain.  In assessing an individual's RFC, the ALJ

16

C.F.R. §§ 404.1520(e)-(g), 404.1560(c), 416.920(e)-(g),
416.960(c).  See Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003).

The initial burden of establishing disability is on the
claimant.  42 U.S.C. § 423(d)(5); Green-Younger v. Barnhart, 335
F.3d 99, 106 (2d Cir. 2003).  If the claimant demonstrates that
he is incapable of performing his past work, the burden then
shifts at step five to the Commissioner to show that the claimant
has the residual functional capacity to perform other substantial
gainful activity in the national economy.  20 C.F.R. §
404.1520(f)(1); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir.
2004), amended on other grounds on reh'g, 416 F.3d 101 (2d Cir.
2005).  A claimant is entitled to receive disability benefits
only if he cannot perform any alternate gainful employment.  20
C.F.R. § 404.1520(f); Perez v. Chater, 77 F.3d 41, 46 (2d Cir.
1996).

## VI.  DISCUSSION

Following the five step evaluation process, the ALJ
determined that plaintiff has not engaged in substantial gainful
activity since the onset of disability, September 1, 2000.

---

considers his symptoms, such as pain, signs and laboratory
findings together with the other evidence.  20 C.F.R. § 404.1545.
"Ordinarily, RFC is the individual's maximum remaining ability to
do sustained work activities in an ordinary work setting on a
regular and continuous basis, and the RFC assessment must include
a discussion of the individual's abilities on that basis.  A
'regular and continuous basis' means 8 hours a day, for 5 days a
week, or an equivalent work schedule."  SSR 96-8p; see Melville
v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).

Although plaintiff presented medical evidence that he suffers from hepatitis C, a history of cardiac artery disease with stent placement and AV block, chronic back pain and a history of opiate dependency, the ALJ found that his impairments do not meet or equal any listed impairment. The ALJ found plaintiff's statements concerning his limitations not entirely credible. The ALJ determined that plaintiff was able to perform his past relevant work as a case manager and concluded that he was not under a disability as defined under the Social Security Act at any time through the date of decision. (R. 24.)

In support of his motion to reverse or remand, plaintiff argues that the ALJ failed to recognize the proper diagnosis of his ailments, failed to consider all medical records, made many factual errors, did not follow the treating physician rule, failed to consider his regular and frequent hospital visits and improperly characterized his past work. The Commissioner argues that the ALJ's decision is supported by substantial evidence.

### A.    Proper Diagnosis

Plaintiff first argues that the ALJ failed to recognize the proper diagnosis of and the severe pain caused by all of his illnesses and ailments. He contends that the ALJ substituted her judgment for that of his treating physician when she concluded that the mild pain referenced in the treating physician's notes did not support plaintiff's need for Oxycontin. Plaintiff argues

further that the ALJ must assume that plaintiff experiences severe ongoing pain that would require the level of pain medication prescribed by his treating physician.

Statements about pain alone do not establish disability. A claimant must first demonstrate, through medical signs and laboratory findings, the existence of a medically determinable impairment that could reasonably be expected to produce the pain alleged. After such an impairment has been identified, the intensity and persistence of the claimant's pain are evaluated based on all available evidence. The claimed pain will not be rejected simply because the objective medical evidence does not support the claim. Other factors which will be considered include the claimant's medical history, diagnosis, daily activities, prescribed treatments, efforts to work and any functional limitations or restrictions caused by the pain. 20 C.F.R. § 404.1529. See Social Security Reg. 96-7p ("In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.")

The ALJ noted that plaintiff presented no evidence of spinal stenosis or any records of a medical examination supporting a diagnosis of debilitating back pain. Records from plaintiff's treating physician reveal only one examination, in March 2004, for chronic back pain. At that time, plaintiff was described as experiencing only mild pain. He had full flexion, extension,

rotation and lateral bending without apparent pain or discomfort.
Dr. Perlin's assessment was lumbar spinal stenosis. (R. 131.)
The ALJ wrote to the treating physician in November 2005 seeking
medical evidence, including laboratory tests, showing spinal
stenosis and debilitating hepatitis C. Dr. Perlin referenced
imaging studies showing severe spinal stenosis in his response
but did not provide them and did not respond to follow-up calls
seeking the studies. (R. 482-83, 502.)

The Social Security Regulations require the ALJ to first
determine whether a medically determinable impairment exists that
would produce pain to the extent alleged. SSR 96-7p, available
at www.ssa.gov. The ALJ considers other factors, such as daily
activities, precipitating or aggravating factors, dosage and side
effects of medication, only after finding the impairment. 20
C.F.R. § 404.1529(c). Plaintiff has provided no medical test
results, examination notes or laboratory studies showing that he
suffers from spinal stenosis. Although he states that he was
involved in two automobile accidents, he provides no medical
records suggesting that his chronic back pain is the result of
either accident. Instead, the only record evidence regarding
plaintiff's complaints of severe chronic back pain, one
examination by Dr. Perlin and the consultative examination, does
not support a finding of debilitating back pain.

An ALJ may rely both on what a medical report says and what
it does not say. Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir.

1995); Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983). Here, the ALJ found that despite plaintiff's allegation that he suffers from severe chronic back pain, his medical records indicate that he was examined for this condition by his treating physician only once between 1997-2005 and no medical records support a diagnosis of spinal stenosis. The ALJ is permitted to draw a negative inference from the lack of treatment. See Arnone v. Bowen, 882 F.3d 34, 39 (2d Cir. 1989) (holding that the Commissioner properly can attribute significance to claimant's failure to seek medical attention and the failure to present any relevant medical evidence during a period of time seriously undermined a claim that he was continuously disabled during that time). Absent evidence of an impairment supporting the complaints of pain, the ALJ did not fail to acknowledge the diagnoses of plaintiff's various illnesses. The court concludes that the ALJ's finding that the record lacks evidence of plaintiff's claim of chronic severe back pain is supported by substantial evidence. Accordingly, plaintiff's motion should be denied on this ground.

**B.    Consideration of All Medical Records**

Plaintiff argues that the ALJ breached her affirmative duty to develop the record when she failed to obtain and consider the June 18, 2004 consultative report from Dr. Joseph Guarnaccia referenced in the agency notice of the initial denial of

benefits.  (R. 28.)

In her decision, the ALJ stated that she reviewed the consultative report of Dr. Weisman.  This report is dated June 16, 2004.  (R. 114-16.)  This report was relied on by Dr. Kaplan, the agency doctor who evaluated plaintiff's residual functional capacity on June 22, 2004.  (R. 117-25.)  There is no indication in the record that plaintiff underwent two consultative examinations at about the same time.  Thus, the court concludes that the listing of Dr. Guarnaccia on the agency Notice of Decision was a mistake.  The notice should have reflected the examination by Dr. Weisman.  Because plaintiff has not shown that he underwent two consultative examinations, he fails to show that the ALJ failed to consider all medical records.

## C.  Factual Errors

Plaintiff contends that the ALJ made eighteen factual errors[7] warranting reversal or remand.  The court considers below

---

[7]Plaintiff identifies the factual errors as:  (1) the ALJ stated that plaintiff did not seek DIB and SSI benefits based on depression; (2) the ALJ stated that he had no cardiac difficulties since he underwent placement of the stent; (3) the ALJ rejected the findings and conclusion of plaintiff's treating physician; (4) the ALJ stated that plaintiff suffers from mild pain; (5) the ALJ made only one attempt to get additional information; (6) the ALJ failed to mention spinal stenosis; (7) the ALJ stated that clinical tests at the hospital were normal; (8) the ALJ stated that plaintiff checked himself out of the detoxification program when he learned he would not receive medication; (9) the ALJ states there was no indication of psychological impairment during his hospitalization for detoxification in January 2004; (10) the ALJ found there was no follow-up for radiculopathy and carpal tunnel syndrome; (11) the ALJ minimalized his mental/emotional illness; (12) the ALJ found

those examples that are not encompassed by plaintiff's other arguments.

## 1. Basis for Request for Benefits

Plaintiff contends, as the first factual error, that the ALJ improperly stated that he did not seek DIB or SSI benefits for depression. In the disability report submitted when he filed his applications, plaintiff listed his impairments as hepatitis C, back pain, leg pain, pelvis pain, shoulder pain, falling down, past drug abuser and heart condition. (R. 72.) He does not list depression or any mental illness. The ALJ simply restated the information provided by plaintiff. This is not a fatal error.

## 2. Hepatitis C

Plaintiff contends, in his seventh, fourteenth and fifteenth factual errors, that the ALJ improperly stated that all hospital tests were normal, found no evidence of asthenia and dismissed his claim for disability as a result of hepatitis C.

Plaintiff states that hospital records show elevated test results, but only cites records after plaintiff's period of

---

no evidence that plaintiff suffers from depression; (13) the ALJ found no evidence of severe psychological impairment; (14) the ALJ found no evidence of asthenia; (15) the ALJ dismissed his claim for disability as a result of hepatitis C; (16) the ALJ dismissed his claim of cardiac disease; (17) the ALJ failed to acknowledge the treating physician statement that he was significantly limited while he was working; and (18) the ALJ failed to acknowledge that plaintiff stated that his past work was at the light and medium levels of exertion and, therefore, improperly found him not credible.

insurability ended.  No treatment records from Dr. Perlin, plaintiff's treating physician, show elevated readings during the relevant time period.  Although Dr. Perlin informed agency officials that plaintiff suffered from asthenia as a result of elevated liver function test results, in his letters to plaintiff, Dr. Perlin repeatedly reported that plaintiff's liver function tests were normal and that his viral load was minimal. (R. 280, 281, 282, 287.)

In November 2005, Dr. Perlin stated that plaintiff was severely impaired as a result of asthenia from chronic hepatitis C but attached no objective medical evidence supporting this assertion.  (R. 501.)  The court concludes that the ALJ's statement that plaintiff's test results were essentially normal is not a fatal error.

### 3.  Psychological Impairment

As factual errors eight, nine, eleven, twelve and thirteen, plaintiff argues that the ALJ failed to properly evaluate his claim of psychological impairment because she stated that plaintiff checked himself out of the detoxification program when he learned he would not receive medication, found no indication of psychological impairment during his hospitalization for detoxification in January 2004, minimized his mental or emotional illness, and found no evidence that he suffers from depression or severe psychological impairment.  In support of this argument,

plaintiff cites only medical records from the brief hospitalization for detoxification. The Commissioner argues that any psychological impairment is related to the detoxification attempt.

Plaintiff questions the accuracy of the ALJ's statement that he checked himself out of the detoxification program because he would not be provided narcotic pain medication. He states that Dr. Perlin continued to prescribe narcotic pain medication to him during this time. The records of the hospitalization indicate that staff offered plaintiff non-narcotic pain medication only. (R. 214, 220.) Plaintiff checked himself out of the program to be able to take the prescribed narcotics. There is no error in the ALJ statement.

Plaintiff is correct that the detoxification records reference psychological symptoms. However, these symptoms appear to have lasted only during the hospital admission. The record contains no medical evidence of continued psychological symptoms after plaintiff left the program and resumed taking his narcotic pain medication. Thus, the ALJ's statement that the hospitalization records do not demonstrate a psychological impairment, that is, the absence of an impairment unrelated to prescription drug abuse, is not erroneous.

Plaintiff also argues that the ALJ failed to acknowledge that he was prescribed Ativan and Valium for severe anxiety throughout the period encompassed by his medical records. Again,

there are no records from plaintiff's treating physician showing that he was treating plaintiff for severe anxiety. In forms completed in November and December 2003, plaintiff does not list any medications for mental health or emotional conditions. (R. 77, 88.) In July and September 2005, Dr. Perlin listed diazepam, the generic form of Valium, as one of plaintiff's medications. (R. 255, 257.) See www.webmd.com/drugs/ (last visited July 25, 2008). There are no medical records indicating the reason this drug was prescribed. Thus, plaintiff's assertion that the record shows that he was taking these medications for the entire period encompassed by the administrative record is incorrect.

Further, there is no referral by Dr. Perlin for mental health treatment and, although plaintiff stated in August 2004 that he took diazepam for stress, no reference of any complaints of anxiety or depression in the treatment notes. Plaintiff did not seek any mental health treatment prior to his attorney's request at the hearing for a consultative psychiatric evaluation. The evaluation forms completed by Dr. Perlin and the agency doctors indicate no psychological impairment or symptoms. Based on this information and the lack of any mental health treatment, the ALJ determined that plaintiff did not have a psychological impairment. The ALJ's conclusion was supported by substantial evidence in the record.

### 4. Cardiac Disease

Plaintiff contends, as factual errors two and sixteen, that the ALJ did not properly evaluate his cardiac condition because she stated that he had no cardiac difficulties since he underwent placement of the stent and dismissed his claim of cardiac disease.  He states that he has been prescribed nitroglycerin for his heart.

While the ALJ's statement may not be completely accurate, the record contains no evidence of the reason for prescribing nitroglycerin or any records from plaintiff's treating physician regarding treatment for a cardiac condition.  The treating physician's records include only one exam for coronary artery disease.  Those notes do not indicate the presence of any issue of concern.  The ECG showed a first degree AV blockage that was unchanged from prior tests.  All other references by the treating physician to plaintiff's heart indicate that the heart was normal.  Most of plaintiff's complaints of chest pain were determined, by emergency room treatment providers, to be GERD.

In his November 21, 2005 letter, Dr. Perlin identified one of plaintiff's conditions as ASCVD (arteriosclerotic cardiovascular disease) status angina pectoris and stated that he needed an imaging study on the recommendation of Dr. Augenbraun. (R. 501.)  However, plaintiff has provided no report or medical records from Dr. Augenbraun or any other medical evidence of serious cardiovascular disease.

Absent any medical evidence showing the existence of a

cardiac condition during the relevant time period that prevents plaintiff from working, the ALJ's misstatement does not undermine her conclusion.

### 5. Follow-up Treatment for Radiculopathy & Carpal Tunnel Syndrome

As factual error ten, plaintiff argues that the ALJ improperly found no evidence of follow-up for radiculopathy and carpal tunnel syndrome. The treating physician's records do include a referral to a hand surgeon and an orthopedic surgeon. There are no medical records showing that plaintiff ever visited either surgeon. Plaintiff states that surgery could not be performed because of his low platelet count, but this statement is unsupported by the record. The court concludes that the ALJ's finding of no evidence of follow-up treatment for radiculopathy or carpel tunnel syndrome is supported by the record.

### 6. Failure to Obtain Medical Records

Finally, plaintiff contends, as factual error five, that the ALJ improperly made only one attempt to obtain additional medical records from his treating physician.

The regulations require that, where insufficient medical information has been provided, the ALJ must recontact the treatment provider. 20 C.F.R. §§ 404.1512(e) & 416.912(e). Here, the ALJ sent one letter and made two follow-up calls. Contrary to plaintiff's contention, there is no requirement in the regulations that the ALJ must send the initial letter and a

follow-up letter to the treatment provider.  This argument is
without merit.

Although plaintiff is correct that the ALJ's published
decision has several errors of fact, these misstatements do not
indicate that the ALJ fabricated evidence, nor does it appear
that the ALJ omitted or ignored any substantive evidence.  The
misstatements cited are not dispositive and do not warrant
reversal of the ALJ's decision.

### D.    Treating Physician Rule

Plaintiff contends that the ALJ failed to accord the proper
weight to the opinion of his treating physician.  The "treating
physician's rule" is a series of regulations set forth by the
Commissioner detailing the weight to be accorded a treating
physician's opinion.  20 C.F.R. § 404.1527; see Schisler v.
Sullivan. 3 F.3d 563, 568 (2d Cir. 1993) (upholding regulations
codifying the treating physician rule).

The regulations provide that the agency will give
controlling weight to the treating physician's opinion regarding
the nature and severity of the claimant's impairment if that
opinion is well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with
other substantial evidence.  If the agency does not give the
treating physician's opinion controlling weight, the court
considers various evidence to determine what weight should be

afforded to the treating physician's opinion.  That evidence
includes the length of the treatment relationship, the frequency
of examination, the nature of the treatment relationship, any
evidence supporting the treating physician's opinion, whether the
treating physician's opinion is consistent with the evidence as a
whole and whether the treating physician is a specialist in the
condition being treated.  20 C.F.R. § 404.1527(d)(2).

Dr. Perlin opined that plaintiff was unable to perform his
past relevant work because he could sit for at most one hour in
an eight-hour workday and could stand or walk either not at all
or for at most one hour.  The ALJ did not give controlling weight
to Dr. Perlin's opinion because his opinion was not supported by
the meager treatment records.  She noted that the provided
records show that plaintiff visited Dr. Perlin only sporadically
and that the treatment notes document little, if any, actual
treatment.  In addition, the few references to actual treatment
indicate that plaintiff was doing well.  The one examination for
chronic back pain revealed that plaintiff had full range of
motion and suffered only mild pain.  A visit for coronary artery
disease showed a normal physical examination.  Although the ECG
revealed a first degree AV blockage, Dr. Perlin expressed no
immediate concerns.  Several letters to plaintiff state that his
viral load for hepatitis C was low and his liver function studies
were normal.  (R. 21.)  The court concludes that the ALJ properly
applied the treating physician rule.  See Halloran v. Barnhart,

30

362 F.3d 28, 32 (2d Cir. 2004) (noting that opinion of treating physician that was not informative and inconsistent with opinions of several other physicians not entitled to controlling weight). Plaintiff's motion is denied on this ground.

### E. Consideration of Hospital Visits

Plaintiff states that the ALJ failed to assume that he was incapacitated for 1-2 days before each hospitalization and for 1-2 days after his release. He argues that if the ALJ had properly considered all of this time, he would not have been able to work at any job on a sustained basis.

Plaintiff cites no regulation requiring the ALJ to assume that, anytime a claimant is seen at a hospital, the claimant was incapacitated for 1-2 days before and after the hospital visit. He refers the court to cases where the claimant was admitted to the hospital for a period of days. See Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987) (claimant's back pain supported by numerous hospitalizations and surgical procedures); Kangas v. Bowen, 823 F.2d 775, 776 (3d Cir. 1987) (claimant presented evidence of eight hospitalizations during sixteen-month period, six of which were hospital stays of 7-10 days followed by 1-2 week recovery period at home); Wolf v. Secretary of Health and Human Servs., 612 F. Supp. 289, 292 (W.D.N.Y. 1988) (claimant presented evidence of six hospitalizations each lasting one week or more).

The only similarity between plaintiff and the claimants in the cited cases is that all sought treatment at hospitals. Unlike the claimants in the cited cases, plaintiff's hospital visits generally lasted less than three hours. Plaintiff often left without obtaining any significant treatment other than a chest x-ray to confirm that his complaints of chest pain were caused by GERD and not a heart condition. The fact that plaintiff used the hospital emergency room instead of calling his treating physician, does not warrant the presumption of lengthy incapacitation he requests.

**F.    Characterization of Past Relevant Work**

Finally, plaintiff contends that the ALJ improperly characterized his past relevant work as performed at the sedentary level of exertion. Plaintiff states that, although the job of case manager in the national economy may be performed at the sedentary level, he cannot perform the job as it is usually performed in the national economy because the job required a college degree or, at least, two years of college education. Although plaintiff attended college for two years, he was not enrolled in a degree program and does not meet that requirement. Thus, plaintiff argues that the ALJ was required to consider the job, as he performed it, which was at the medium level of exertion.

The ALJ found that plaintiff has the residual functional

capacity to sit, stand and walk for up to six hours in an eight-hour workday, can lift up to twenty-five pounds occasionally and up to fifteen pounds frequently.  (R. 24.)  This assessment is between the requirements for the light and medium levels of exertion.[8]

Plaintiff provided inconsistent information regarding the lifting requirements of his previous job.  In November 2003, he stated that the heaviest weight he lifted was twenty pounds, but that he frequently lifted twenty-five pounds.  (R. 73.)  In February 2004, plaintiff again stated that the heaviest weight he lifted was twenty pounds and he frequently lifted less that ten pounds.  (R. 140.)  The ALJ accepted the consistent information and rejected the inconsistency, i.e., that plaintiff frequently lifted an amount heavier that what he consistently reported as the heaviest weight lifted.

At the hearing, plaintiff stated that he sometimes shoveled snow, helped make repairs and unloaded deliveries of food when residents of the shelter would not help.  (R. 573-74.)  He provided no information on the weight of the bags of food.  The ALJ interpreted these statements as an attempt to change the requirements of the job from the light to medium level of

---

[8]The medium level of exertion requires a claimant to lift up to 25 pounds frequently, and more than that infrequently.  20 C.F.R. § 404.1567(c).  The light level of exertion requires a claimant to lift up to 20 pounds occasionally and up to ten pounds frequently.  20 C.F.R. § 404.1567(b).

exertion, and rejected the attempt.

As discussed above, the ALJ rejected the treating physician's opinion regarding plaintiff's residual functional capacity because the opinion was not supported by any medical evidence.  Because the ALJ's residual functional capacity assessment encompasses plaintiff's description of the lifting requirements of his past relevant work, the ALJ did not err in concluding that plaintiff failed to show that he was unable to perform that job.

### G.   Substantial Evidence Supporting Commissioner's Decision

The defendant contends that the Commissioner's decision is supported by substantial evidence and should be affirmed.  The court agrees.

As discussed above, the ALJ's findings are supported by the evidence of record.  As such, her decision that plaintiff is not disabled is supported by substantial evidence.  Accordingly, defendant's motion should be granted.

### VII. CONCLUSION

For the reasons stated above, the undersigned recommends that plaintiff's Motion for Order Reversing the Decision of the Commissioner or in the Alternative Motion to Remand for a Rehearing [**Doc. #15**] be **DENIED** and defendant's Motion to Affirm the Decision of the Commissioner [**Doc. #19**] be **GRANTED.**

The parties are free to seek the district judge's review of

this recommendation.  <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; D. Conn. L. Civ. R. 72 for Magistrate Judges;  <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989) (failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).

Entered this 26th day of August 2008, at Bridgeport, Connecticut.

/s/
_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE
